**STATE of Missouri, Respondent,**

v.

**Ricky Lee WELLS, Appellant.**

No. 63412.

Supreme Court of Missouri,
En Banc.

Aug. 23, 1982.

Rehearing Denied Oct. 12, 1982.

Hale W. Brown, H. William Brown, Kirkwood, for appellant.

John Ashcroft, Atty. Gen., Mark W. Cowley, Asst. Atty. Gen., Jefferson City, for respondent.

BARDGETT, Judge.

Appellant Ricky Lee Wells was charged with second-degree murder (§ 565.004, RSMo 1978) in the death of Gary Pierce. Appellant was convicted of manslaughter (§ 565.005, RSMo 1978) and sentenced to ten years' imprisonment. Appellant appealed and after opinion in the Missouri Court of Appeals, Eastern District, this Court ordered the cause transferred on appellant's motion.

Appellant's assignments of error include the trial court's failure to grant a mistrial as the result of the state's failure to disclose an admission of guilt by appellant pursuant to Rule 25.03 (former Rule 25.32), the trial court's failure to grant a mistrial after a state's witness during cross-examination referred to a polygraph examination he had taken, the trial court's giving of MAI–CR2d 4.50 and MAI–CR2d 1.10 to the jury in the early morning after all-night deliberations, and the trial court's failure to provide a written copy of MAI–CR2d 1.10 to the jury as required by Rule 28.02(f) (former Rule 20.02(f)).

In the late morning of November 3, 1979, appellant, his brother, Gary Wells, and his first cousin, Tom Wells, drove in Tom Wells's pickup truck to a spot along the Big River called Big River Point, approximately three miles north of Bonne Terre in St. Francois County, Missouri. They set up targets and proceeded to adjust the scope of a .22 rifle. They also brought another .22 rifle and a shotgun with them.

Approximately one hour later, Willard Rosener, a cousin of the appellant, and Gary Pierce, an acquaintance of the appellant, arrived at the spot in Pierce's pickup truck to cut firewood. The evidence indicated that the five men drank beer and cut firewood together during the afternoon.

Late in the afternoon, Tom Wells and Gary Pierce began "slapboxing". Tom Wells eventually punched Pierce in the mouth and bloodied his lip. Wells began to apologize, but Pierce tried to strike him and Wells punched Pierce again, knocking him to the ground. At this point, Rosener grabbed Pierce and attempted to break up the fight, but then Rosener and Tom Wells began to fight. As Pierce started to get up, appellant jumped on him and yelled, "I got this one." Appellant was observed kicking at Pierce while Pierce was lying on the ground. Appellant testified that he struck Pierce at least nine times with his fist.

Meanwhile, Rosener ran from the scene after Tom Wells headed for his pickup truck, threatening to shoot him. Tom Wells got into the truck and pursued Rosener, with Gary Wells following on foot. Appellant was left behind with Pierce.

Tom and Gary Wells originally told police that when they returned to the spot of the fight, they found appellant on top of Pierce, crying. They pulled him off of Pierce, who was bleeding profusely from the head. Tom Wells drove Gary Wells and appellant to Tom Wells's father's house approximately two miles away, but the father was not there. The three returned to Pierce's body, then drove to the Bonne Terre police station but found no one there. They drove to their uncle's house and then to a restaurant where Tom Wells, on reaching the Flat River police dispatcher by phone, said, "I just killed a man."

The appellant, Tom and Gary Wells then drove to the Bonne Terre police station, arriving at approximately 6:00 p. m. Ap-

pellant told a police officer he had fought with Pierce until Pierce "did not move anymore". Appellant told the officer he hit Pierce with his fist and his feet, and at one point said to the officer, "I must have killed him."

After receiving the call, police officers went to the fight scene and discovered Pierce's body. There was a log lying on Pierce's left arm and two logs were lying within five feet of the body. There were blood stains on each log. Blood was also found on one of appellant's shoes. An autopsy of Pierce's body indicated that death was caused by multiple fractures of the skull and the accumulation of blood inside the cranial cavity.

The state introduced the logs into evidence and charged that appellant had killed Pierce "by striking him with a blunt object." A pathologist testified for the state that death was caused by "brain death" and that the deceased had suffered multiple skull fractures caused by blunt force injuries which indicated that an object was applied "with considerable force."

Appellant testified that he had hit Pierce with his fist because he was afraid Pierce would stab him with a knife. There was testimony that Pierce had displayed a silver pocket knife earlier in the day. Appellant testified that as Pierce began to stand up he had his hand in his pocket and said, "I'm going to cut your living guts out, [Ricky] Wells." Appellant stated that he did not actually see a knife in Pierce's pocket at this time. Police later found a silver pocket knife in Pierce's pickup truck. Appellant testified that he hit Pierce only with his fist, and denied he kicked him or struck him with any other object.

At trial Tom Wells, as a witness for the state, presented a new version of the events, testifying that when he returned to the scene of the fight, he saw appellant throw a log at Pierce, who was lying on the ground, but that the log did not hit Pierce. When appellant picked up another log and tried to hit Pierce, Tom Wells said he (Tom Wells) blocked it with his leg. Tom Wells also testified that appellant later stated that he had hit Pierce with a log, and that appellant, Tom Wells, and Gary Wells agreed not to mention this to the police. Appellant and Gary Wells denied this during their testimony.

■ Appellant's first assignment of error relates to this testimony of Tom Wells and the state's failure to disclose the contents of it to defense counsel prior to trial. While this point is not decisive with respect to the disposition of this case, it represents a situation occurring with increasing frequency and the Court believes it important to emphasize that compliance with the discovery rules is not at the discretion of the state.

On Saturday, February 23, 1980, three days before the appellant's trial began, Tom Wells had gone to the assistant prosecuting attorney of St. Francois County and revealed this information for the first time. Three days later at the trial, Tom Wells testified that this was the first time he had mentioned to prosecuting authorities that appellant had thrown logs at Pierce, and that appellant had admitted to Tom Wells of hitting Pierce with a log. Defense counsel asserts he first learned of this new version of events during the state's opening statement.

The prosecutor's office had furnished defense counsel with all relevant material up to the point of Tom Wells's statements on Saturday, February 23, 1980. Defense counsel had sought a bill of particulars on February 15 to clarify in what manner the state was alleging that the appellant struck Pierce. The state said it could not do so, beyond stating that appellant struck Pierce with a "blunt object", and that the blunt object could include the logs, appellant's boots, or the butts of the guns present at the scene.

Defense counsel was thus left with the clear impression that the state could not tie appellant directly with logs seized at the scene. In fact, the assistant prosecutor admitted at the hearing on the motion for the bill of particulars on February 15,

It's a circumstantial case, Your Honor. We don't have somebody who actually

can say, "Hey, he picked up that log," or "he picked up that gun butt" or "he did this." We don't have that. All I can say is that my pathologist can say that there was a blunt object used, with no delineation, outside certain perimeters, which fits a large number of blunt objects. Yet, eight days later, Tom Wells went to the assistant prosecutor and told him that he had seen appellant attempt to hit Gary Pierce with logs, and that appellant had admitted to him that he had struck Pierce with a log. These statements were both highly relevant to the case and directly contradictory to earlier statements made by Tom Wells regarding the fight between appellant and the deceased, Gary Pierce.

■ Tom Wells's testimony directly contradicted his earlier statements which had not connected appellant with the logs found near the deceased's body. Tom Wells was an important state witness, in fact the *only* witness who could provide a connection between the blood-stained logs and the deceased. Impeachment of that testimony was therefore crucially important to the appellant. The purpose of Rule 25.03 includes the opportunity for a defendant to prepare in advance of trial for the impeachment of a witness by that witness's own testimony. *State v. Dayton,* 535 S.W.2d 469 (Mo.App.1976).

■ The state cannot logically contend that it was unaware this information would be meaningful to appellant's counsel. By withholding disclosure until its opening statement at trial, the state achieved the very result the discovery rules were designed to prevent—surprise and deception. The discovery rules seek to foster informed pleas, expedited trials, a minimum of surprise, and the opportunity for effective cross-examination. *State v. Buckner,* 526 S.W.2d 387, 392 (Mo.App.1975). *See also State v. Scott,* 479 S.W.2d 438, 442 (Mo. banc 1972). The state's failure to disclose served only to thwart these goals. We regard the state's action in this case to be deceptive and a matter of serious concern, but this concern does not control the disposition of this case.

Appellant's next assignment of error concerns the giving of MAI–CR2d 4.50 and 1.10 to the jury shortly after 5:00 a. m., following all-night deliberations.

This trial began Tuesday, February 26, 1980, in Farmington, Missouri, with the state's opening statement beginning sometime that afternoon. Later in the day the jury was sequestered for the night at a local motel. The jury reconvened Wednesday, February 27, at 9:00 a. m. At approximately noon, the jury recessed for lunch, and later in the day recessed for dinner, returning at 7:00 p. m. Testimony continued into the evening. At the conclusion of the testimony, a recess was taken prior to the giving of jury instructions. The jury retired to deliberate at 10:27 p. m. and requested all the evidence at 10:55 p. m.

The jury deliberated until 5:01 a. m., when they were called back in by the court and asked their numerical standing. Without indicating which party was favored, the foreman indicated the vote was 11 to 1. The court at 5:02 a. m. gave the jury instruction No. 14, which was MAI–CR2d 4.50, commonly known as the "Kerry Brown" instruction. The court then asked the foreman if he believed the jury could reach a verdict with further deliberation. The foreman stated, "We've not given up to attempt that." The court at that point read MAI–CR2d 1.10, the "hammer" instruction, to the jury. The jury resumed deliberations and at 6:03 a. m., approximately fifty-six minutes later, returned with a verdict finding appellant guilty of manslaughter and fixing punishment at ten years in the department of corrections.

The giving of these two instructions under the circumstances in this case was plain error requiring the judgment to be reversed and remanded for a new trial.

The Court notes initially that the length of time a jury is allowed to deliberate is a matter within the discretion of the trial court. *State v. Covington,* 432 S.W.2d 267, 271 (Mo.1968). We caution, however, that the better practice in this instance would have been for the trial court to ask the

jurors at a reasonable hour whether they preferred to continue deliberations or would rather resume their deliberations the next day after resting for the night, especially since the court had observed earlier that the jury was tired. The record indicates that, minus recesses of undetermined periods of time on three occasions, the jury considered this case for slightly longer than twenty-one consecutive hours on Wednesday and Thursday, February 27 and 28. After retiring to consider a verdict at 10:27 p. m., the jury was not given a break, nor asked if they desired one, until they reached a verdict the following morning, even though the trial court had commented much earlier in the day that the jury was "tired". The giving of MAI–CR2d 4.50 and 1.10 must be considered within this context.

Instruction No. 14, MAI–CR2d 4.50, reads as follows:

The Court will now read to you an additional instruction which will be handed to you with an additional form of verdict.

If you unanimously find the Defendant guilty you should fix his punishment. If, however, after due deliberation, you find the Defendant guilty but are unable to agree upon his punishment, you will complete the verdict form so stating, and in that event the Court will fix the punishment.

You must bear in mind that under the law it is the primary duty and responsibility of the jury to determine whether the Defendant is guilty or not guilty, and if he is guilty to fix the punishment.

### Verdict

We, the jury, find the Defendant, Ricky Lee Wells, guilty of murder in the second degree as submitted in Instruction No. 5, but we are unable to agree upon the punishment.

### Verdict

We, the jury, find the Defendant, Ricky Lee Wells, guilty of manslaughter as submitted in Instruction No. 7, but we are unable to agree upon his punishment.

■ The "Kerry Brown" instruction informs the jury that if it can agree on guilt but not punishment, then the court will fix the punishment. It is within the discretion of the trial court to give this instruction. *State v. Greer,* 616 S.W.2d 82, 85 (Mo.App. 1981); *State v. Carroll,* 562 S.W.2d 772, 773 (Mo.App.1978). This discretion is not unlimited however. The instruction may be given, whether requested or not, "if after due deliberation by the jury the court finds the jury cannot agree on punishment." MAI–CR2d 4.50, Notes on Use, 1; § 557.-036.2, RSMo 1978 (now RSMo Cum.Supp. 1981).

■ There is no question but that there was "due deliberation" in this case. The jury had been deliberating approximately 6½ hours before the court called them back at 5:01 a. m. This instruction has been approved after much shorter deliberations. *See, e.g., State v. Noble,* 591 S.W.2d 201 (Mo.App.1979) (1 hour, 14 minutes); *State v. Carroll, supra* (3 hours). When this instruction is to be given, however, depends not only on time but also on the circumstances. *State v. Noble, supra,* 591 S.W.2d at 205.

The trial court did not find that the "jury cannot agree on punishment" as required by statute and the Notes on Use. The court at 5:01 a. m. asked for the jury's numerical standing without asking which party they favored. After learning the vote was 11 to 1, the court then proceeded to give instruction No. 14 (MAI–CR2d 4.50) *before* asking the foreman if he believed a verdict could be reached.

■ The plain language of § 557.036 is that this instruction is to be given, if at all, *only* after "due deliberation" by the jury *and* a determination by the court that the "jury cannot agree on punishment". There was no such finding in this case. In fact, the jury had not yet agreed on a *verdict* in this case.

Although a reading of MAI–CR2d 4.50 and § 557.036 together may not indicate that a *formal* verdict of guilty be returned before the instruction may be given, *State*

*v. Summerland,* 610 S.W.2d 392, 394 (Mo. App.1980), it would seem at least a determination by the court that the jury is uncertain as to punishment and not guilt be a prerequisite for the giving of the instruction in the form it was submitted. Otherwise, the statute is stripped of its plain meaning.

■ No verdict as to guilty or not guilty had been reached in this case. And it seems implausible that a judge can determine whether a jury is hung on the question of punishment before knowing if a determination of guilt could be reached. Indeed, punishment is irrelevant if the verdict is to be not guilty. While the court was not told that eleven favored a verdict of guilty, it did give instruction No. 14 which contained the word "guilty". The psychological impact of this instruction cannot be overlooked. One juror was at odds with the eleven others. After 6½ hours of deliberation and approximately twenty hours after the day's proceedings had begun, the court gave instruction No. 14. It is not unreasonable for a lone dissenting juror to believe in such an instance that the court is speaking directly to him or her, and the message is clear: The defendant's guilt has been agreed on. Move on to punishment. The giving of this instruction under these circumstances constitutes error.

■ That error was compounded by the additional giving of MAI–CR2d 1.10, the "hammer" instruction, immediately after instruction No. 14. MAI–CR2d 1.10 provides:

It is desirable that there be a verdict in every case. The trial of a lawsuit involves considerable time and effort, and the parties are entitled to have their rights determined once and for all in every case. The twelve jurors chosen to try this case should be as well qualified to do so as any other twelve that might hereafter be chosen. Open and frank discussion by you in your jury room of the evidence in this case may aid you in agreeing upon the facts; however, no juror should ever agree to a verdict that violates the instructions of the Court, nor find as a fact that which under the evidence and his conscience he believes to be untrue. Yet each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict.

The giving of this instruction is within the trial court's discretion. *State v. Cummings,* 612 S.W.2d 807, 811 (Mo.App.1981). It has been approved when given in conjunction with MAI–CR2d 4.50. *State v. Carroll, supra,* 562 S.W.2d at 773.

When this instruction is given, however, "in addition to being read to the jury, [it] *shall* be handed to the jury. It *shall* be numbered and, when returned by the jury, filed with the other instructions of the court as provided in Rule 20.02(f) [now Rule 28.02(f) ]." MAI–CR2d 1.10, Notes on Use, 2 (emphasis added). The trial court failed to hand the instruction to the jury, failed to number it or file it with other instructions that were submitted, if it was in written form at all. Defense counsel admits he failed to object properly but says he was unaware of the court's error until several days later.

■ The requirement that this instruction be given in writing to the jury appears to be absolute. Again, we must consider this error within the circumstances of this case. The jury had been deliberating for approximately 6½ hours without a break. They had been considering the case virtually nonstop for some twenty hours. They had just been given an instruction regarding the determination of punishment. Then they were read this "hammer" instruction which advised them of the desirability of reaching a verdict of some sort. A guilty verdict was returned approximately fifty-six minutes later.

■ We conclude that the requirement of Rule 28.02(f) (former Rule 20.02(f)) that the jury be given a written copy of this instruction was even more necessary in this case. Jury deliberations had been long; the hour was very late. The trial judge had noted much earlier in the day that the jury was "tired". It was important in this con-

text that the jurors not speculate or argue about what the judge had said to them. This is an important requirement in any case; it was especially so in this case.

One cannot avoid the impact of MAI–CR2d 4.50 and 1.10 given back-to-back after deliberations of 6½ hours and consideration of the case for approximately twenty-one consecutive hours. Combined with the fact that MAI–CR2d 1.10 was not given to the jury in writing, it would seem this did have a coercive effect on the jury.

 Whether any one of these factors is enough to reverse and remand this case is not decided; but the *combination* of these factors—lengthy jury deliberations, the giving of MAI–CR2d 4.50 before the jury had reached a decision as to guilt and before the court had determined that the jury could not agree as to punishment, and the oral giving of MAI–CR2d 1.10 immediately thereafter without a written copy being submitted to the jury—constituted reversible error in this case. Although MAI–CR2d 1.10 notes the desirability of reaching a verdict in every case, it is only desirable if that verdict is arrived at fairly. The other assignments of error need not be considered.

Reversed and remanded.

All concur.