**STATE of Missouri,
Plaintiff/Respondent,**

v.

**Michael J. STALLINGS,
Defendant/Appellant.**

**Michael J. STALLINGS,
Movant/Appellant,**

v.

**STATE of Missouri,
Respondent/Respondent.**

Nos. 57761, 59113.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 28, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 26, 1991.

Application to Transfer Denied
Sept. 10, 1991.

Henry B. Robertson, Asst. Public Defender, St. Louis, for defendant/appellant.

William L. Webster, Atty. Gen., Robert P. Sass, Asst. Atty. Gen., Jefferson City, for plaintiff/respondent.

REINHARD, Presiding Judge.

Defendant appeals his convictions of murder in the first degree, § 565.020, RSMo 1986, two counts of armed criminal action, § 571.015, RSMo 1986, assault in the first degree, § 565.050, RSMo 1986, and burglary in the second degree, § 569.-170, RSMo 1986, for which defendant was sentenced by a jury to serve concurrent sentences of life, ten, ten, twenty, and four years imprisonment respectively. Defendant also appeals from the dismissal, without an evidentiary hearing, of his Rule 29.15 motion to vacate judgment and sentence. Pursuant to Rule 29.15(l), these appeals have been consolidated for review. We affirm.

The evidence at trial revealed that, in 1985, Donna Stallings divorced defendant because he was abusive to her. Although defendant returned to live in Ms. Stallings' home for a short time after the divorce, he renewed his abuse and was removed from the home by the police. Ms. Stallings' sister, Brenda Abshier, moved in to the home to help care for Ms. Stallings' children and deter defendant from visiting. Ms. Stallings also changed the deadbolt lock on her front door, although she never retrieved the other lock's key from defendant.

Ms. Stallings testified that defendant's jealousy led him to threaten suicide many times in the few months before the shooting, including one incident where defendant played Russian roulette. On February 27, 1987, Ms. Stallings called the police when defendant refused to leave her home. After the police gave defendant an opportunity to remove his clothing and other belongings, they told him that, because Ms. Stallings did not want him there, he would be charged with trespassing if he returned, and with burglary if he entered the premises. On March 3, after defendant returned, Ms. Stallings called the police and had defendant arrested for trespassing. The police told defendant that he would be arrested every time he returned to the home. On March 17, defendant came to the house to use tools that he still kept there. When Ms. Stallings told defendant that she had to break their plans for the evening because of a prior commitment, he asked for the bullets to his handgun, then smashed her curling iron, kicked the thermostat off the wall, and turned over a fish tank as Ms. Stallings ran to the neighbor's house to call the police. After he ran Ms. Stallings' car into her garage wall, defendant was arrested. At the urging of his parents and Ms. Stallings, defendant was admitted as an inpatient to the stress unit of a nearby hospital for psychiatric care. Defendant apparently received counseling and medication but discontinued both after a short time.

Two weeks before the May 26 shooting, Abshier returned home to find defendant hiding in the bushes by the front door. When she refused to let him inside he left. The next morning, Ms. Stallings drove up to the home and saw defendant, splattered with blood, run to her car with a knife. He got in the car and drove her to their children's school. During this episode defendant slapped Ms. Stallings with the knife and used it to mutilate her shoes. In addition to threatening to kill himself, he told her she wouldn't have to worry about the children ever again, and threatened to use tape he had placed around his midsection to bind her and put her in the trunk. Ms. Stallings eventually convinced defendant to let her go. When she returned home, she found that the phone line had been severed.

On May 25, the day before the shooting incident, Ms. Stallings and Ms. Abshier returned from a weekend camping trip with

Randy Webber, who was Ms. Stallings' boyfriend, and Webber's roommate, Rob Smith. When defendant arrived at the home, she told him he should leave and call later, as it was not a good time. Despite Ms. Stallings' statement that she did not want to be in the house with him by herself, defendant entered the home. Webber and Smith followed defendant into the house, and after telling defendant he could not speak with Ms. Stallings, Webber grabbed defendant from behind and Smith attempted to punch him. Defendant told Ms. Stallings that Webber could not have her and his children. The police were called again. Ms. Stallings and Abshier did not return home that night.[1]

The next day at dusk, Abshier and Smith returned to Ms. Stallings' home. After Abshier unlocked the front door, the two entered the home and heard a sound from upstairs. Smith took out a pocket knife that he often carried and opened it. Abshier told him not to go upstairs and said they should leave. Smith told her to stay at the bottom of the stairs and quickly climbed the stairs two at a time. Immediately after he turned left out of sight at the top of the stairs, Abshier heard two "pops" like a gun firing, a moan, and a thump. As she attempted to leave by the front door to call the police, she mistakenly locked the door. She heard a series of "pops", felt a burning sensation and fell to the floor.

Defendant came downstairs and looked out the windows for others. He returned to Abshier and asked for the phone number of the place where Ms. Stallings was staying but Abshier said she did not have it. He brought her to the top of the stairs and found the phone number in Abshier's purse. Defendant called pretending to be Abshier's sister, but did not speak to Ms. Stallings. Defendant called his parents and told the person answering that he had shot Abshier and Smith, and then called an ambulance at Abshier's insistence. During the phone calls, Abshier tried to calm defendant, but he said that she was making him anxious and told her he would shoot her again if she didn't shut up. Defendant sat down in front of the couch and Abshier heard a shot. Holding his stomach, defendant got up, unlocked the front door, and then sat down on the couch.

When a police officer arrived at the home in response to a call from the telephone operator, he started upstairs to render aid to Abshier. He saw defendant reach for a rifle on the floor next to the couch upon which defendant was sitting. The officer placed the rifle out of defendant's reach. Defendant told another officer rendering first aid to him that there was another person in the bedroom. The officer found Smith dead in the bedroom upstairs. When the officer searched the rest of the home, he found items smashed throughout the home, cut marks in the drywall, and slashes in paintings and clothing. Defendant's rifle was fully loaded when the police arrived.

Defendant testified that he went to the house at about 4:30 a.m. on his way to work, to get an electric meter he had borrowed from his employer. Defendant left and returned to the house several times. Defendant returned to the house on foot the final time after leaving his car in his child's school parking lot, because he claimed it would not start. He attempted to phone Ms. Stallings several times, but did not reach her.

He became depressed and thought of slashing his wrists, but could not. He used a razor to slash paintings on the wall, wedding pictures, and clothing in the closet. While in the closet he saw a rifle, which he used to smash belongings in the bedroom. He claimed that when Smith approached him with an open knife and threatened to kill him, he shot Smith in self-defense. He said that he never reloaded the rifle, and that he did not reach for the rifle when police arrived.

Defendant was charged with first degree murder in the death of Smith, first degree assault in the shooting of Abshier, second degree burglary for his entry into the home, and two counts of armed criminal

1. The next day, fearing for her safety, Ms. Stallings obtained a court order to keep defendant away; however, defendant was unaware of the order.

action for his use of the rifle. Defendant's defenses were self-defense to the murder charge, and diminished capacity to both the murder and the assault. After his convictions, defendant filed a direct appeal and an appeal from his Rule 29.15 motion, which was denied without an evidentiary hearing.

Defendant in his principal point contends that the verdict was coerced because of the length of time that the trial court permitted the jury to deliberate, and because the trial court submitted MAI–CR3d 312.10, the so-called hammer instruction, toward the end of deliberations. On Friday at 4:42 p.m., after five days of trial, the case was submitted to the jury. At 8:55 p.m. the jury sent the trial court a note with a question concerning the instructions. With the approval of counsel, the court instructed the jury to be guided by the instructions. At 2:30 a.m. the foreman informed the court by note that the jury was deadlocked 11 to 1 on the issue of self-defense, but did not indicate which party was favored by the deadlock. When the court proposed to tender the hammer instruction, defendant's counsel objected and requested that the court instruct the jury to "consider the instructions and arrive at a verdict and if they can't, then they are to indicate that they cannot do so." When the jury returned to the courtroom, the court asked the foreman if there was any possibility of arriving at a verdict upon further deliberations, to which he replied "that's always the possibility ... but after quite numerous hours we've tended to have a stalemate." The court then said, "Ladies and gentlemen, I know it's late and I think that perhaps we're even more tired than you are because we have spent the hours in inactivity where at least you've had an opportunity to yell at each other a little while," and the court read and submitted the hammer instruction with a direction to "resume deliberations in this matter."

At 4:20 a.m. the court received another note from the jury questioning the consistency of two instructions, to which the court, after approval by defendant's counsel, responded with a note reading "No.

Read the applicable instructions carefully." At this point, out of the hearing of the jury, the court said, "Now, we were discussing whether or not we were going to send this jury home at this point." Defense counsel admitted that:

it may appear moot in the fact that they have now sent us a note. But prior to them sending the note, I had expressed to the Court that it is now 4:20 in the morning, ... that I question whether or not they are becoming worn down physically and mentally as a result of deliberating this late into the evening, and I suggest to the Court that they are unable to arrive at a decision, that a mistrial be granted.

The court then stated:

When it becomes obvious to the Court that they are no longer able to arrive at a decision, then a mistrial will of course be granted. However, this jury has had no qualms about sending questionnaires and making other communications to the court during their deliberations and I feel that when they have reached that point they will so notify us.

At 5:20 a.m. the jury returned verdicts of guilty on all counts.

We note that the fact alone that the jury was permitted to deliberate approximately twelve hours does not establish coercion. Neither does the fact that the hammer instruction was given after nine hours of deliberation. As recently as 1985, the Missouri Supreme Court said:

the length of time which a jury is allowed to deliberate as well as a determination of whether to read MAI–CR2d 1.10 [the predecessor to the present day hammer instruction] to the jury are matters committed to the sound discretion of the trial court. See *State v. Broadux,* 618 S.W.2d 649, 651 (Mo. banc 1981); *State v. Covington,* 432 S.W.2d 267, 271 (Mo.1968). In order to establish an abuse of that discretion it must be shown that, based upon the record of what was said and done at the time of trial, the verdict of the jury was coerced. *State v. Talbert,* 454 S.W.2d 1, 4–5 (Mo.1970).

*State v. Anderson,* 698 S.W.2d 849, 853 (Mo. banc 1985). Applying this well-established standard we can find no abuse of discretion here. The jury clearly continued deliberations up until the verdict. The jury continued to inquire of the court and made neither complaints of fatigue nor a request for an opportunity to rest. The court indicated that it was not obvious that the jury was unable to arrive at a decision. Defendant's own counsel, when objecting to the submission of the hammer instruction, suggested that the jury be allowed to reach a verdict. Shortly after defendant's counsel first requested a mistrial, he stated that the issue was moot because the jury was still questioning at that time. The lack of coercive effect of the hammer instruction is shown by three hours of deliberation after its submission. The record clearly demonstrates that the trial court did not abuse its discretion.

Defendant primarily relies upon two cases for reversal: *State v. Wells,* 639 S.W.2d 563 (Mo. banc 1982), and *State v. McNail,* 767 S.W.2d 84 (Mo.App.1989). This reliance is misplaced because of the difference in circumstances. In *Wells* the case was submitted to the jury at 10:27 p.m. At 5:01 a.m. the foreman indicated an 11 to 1 deadlock, and the court, after reassurance from the foreman that they had not given up reaching a verdict, gave the hammer instruction and the "Kerry Brown" instruction informing the jury that the court would fix punishment if the jury could only agree on a verdict. The jury returned a verdict approximately 56 minutes later. The Missouri Supreme Court reversed, finding a coercive effect from the *combination* of lengthy deliberations, failure to give a written copy of the hammer instruction, and the giving of the "Kerry Brown" instruction before the court had determined that the jury had reached a decision on the guilt or innocence of the defendant. The facts here are also distinguishable from those in *McNail.* During seven hours of deliberations, the jury sent two notes indicating a deadlock, including a note stating that two jurors voting not guilty could not compromise their opinions and inquiring how long they must deliber-

ate until a hung jury was declared. The court gave the hammer instruction and, after an hour without a verdict, had the sheriff inform the jury that they would be sent to a hotel for a break before they resume deliberations on Sunday. The jury returned a guilty verdict ten minutes later. We held that these circumstances required a reversal. As stated, we find no abuse of discretion here; however, "[w]e caution ... that the better practice in this instance would have been for the trial court to ask the jurors at a reasonable hour whether they preferred to continue deliberations the next day...." *State v. Wells,* 639 S.W.2d 563, 566–567 (Mo. banc 1982).

Defendant next contends that the State did not make a submissible case of first degree murder because there was insufficient evidence of deliberation. In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the State and all favorable inferences to be drawn therefrom, disregarding evidence to the contrary. *State v. Smith,* 621 S.W.2d 94, 95 (Mo.App.1981). Deliberation is present when the act of killing occurs after "cool reflection for any length of time no matter how brief." § 565.-002(3), RSMo 1986. Deliberation may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying. *State v. Stewart,* 714 S.W.2d 724, 725 (Mo.App.1986). Here, there was sufficient evidence of deliberation. Defendant's car was not in front of Ms. Stallings' house, but parked in the school parking lot, as it was when he had abducted Ms. Stallings in an earlier incident. After destroying many objects in the home, defendant obtained a rifle which he brought into the children's bedroom. The evidence clearly demonstrated that he shot Smith twice, then repeatedly shot Abshier. The jury was entitled to disbelieve defendant's exculpatory version of the incident. Resolution of the issue depended upon defendant's credibility and the weight given his testimony, both of which are matters for the jury to determine. *State v. Armbruster,* 641 S.W.2d 763, 765 (Mo.1982).

Defendant also contends that the State failed to make a submissible case of second degree burglary, arguing that the State's evidence failed in two respects: first, that defendant was privileged to enter the home to remove his belongings, and the State failed to prove that defendant entered for any other purpose; second, that there was no evidence that defendant intended to commit an assault upon entry to the home. To support his claim of privilege, defendant relies upon testimony by Ms. Stallings that she told defendant he could get his things whenever he wanted, and that, although she couldn't remember, she may have given him permission to get the things on the day of the shooting.

A review of the evidence in the light most favorable to the verdict, however, shows that after the scuffle at her home on Monday, she asked him to leave and told him he could call her to "discuss what he needed to discuss." When asked if she gave him permission to enter the house and stay all day, she answered, "No. I don't remember even, you know. No." When asked if she gave him permission to enter the home at 4:30 a.m. or to break things inside the home, she answered, "No." From this evidence, the jury could find that defendant either had no privilege or exceeded his privilege to enter the home. Defendant's argument that there was no evidence of intent to assault at the time of entry is also misplaced. Defendant had assaulted Ms. Stallings in the past, and parked his car in a location where it would not alert anyone to his presence inside the home. Furthermore, evidence that the assault was completed is evidence from which the fact finder may find that the prior intent to do so existed at the time of entry. See State v. Chandler, 635 S.W.2d 338, 342 (Mo. banc 1982).

Defendant also contends that the trial court erred in submitting his proffered instruction on self-defense. Defendant correctly asserts that his instruction contained an optional paragraph in MAI–CR3d 306.06 in violation of the Notes on Use. Although the giving of an instruction in violation of the Notes on Use is error, we must deter-mine its prejudicial effect. Rule 28.02(f). The instruction was given at defendant's request, and defendant did not object at trial. Defendant did not raise his allegation of error in his motion for new trial, as required by Rule 28.03. Defendant presented and argued self-defense to the jury. Defendant is in no position to complain of error or prejudice, State v. Preston, 673 S.W.2d 1, 9 (Mo. banc 1984), and we find no prejudice here.

Defendant's other complaints of error raised on direct appeal were not properly preserved. We have carefully examined the record and find that no prejudice resulting in manifest injustice occurred. Defendant alleges that the prosecutor made prejudicial remarks during closing argument, and that the prosecutor's closing argument included use of psychiatric testimony as substantive evidence of guilt in violation of § 552.020.12 and § 552.030.5, RSMo 1986. Defendant made no objection to these arguments at trial, and thus failed to preserve them for review. State v. Simms, 743 S.W.2d 465, 467 (Mo.App. 1987). Defendant also argues that the trial court erroneously excluded the testimony by a psychiatrist that defendant's mental disease caused him to have a diminished mental capacity negating the mental state necessary for a conviction of first degree assault. Defendant did not make an offer of proof demonstrating that this would have been the substance of the psychiatrist's testimony, and thus did not preserve his point for review. State v. Dixon, 655 S.W.2d 547, 557 (Mo.App.1983).

Defendant asserts several points of error by the Rule 29.15 motion court in denying his motion without an evidentiary hearing. He claims that he alleged facts which show various incidents of ineffective assistance of counsel. Our review is limited to determining whether the findings and conclusions of the motion court are clearly erroneous. Taylor v. State, 782 S.W.2d 741, 743 (Mo.App.1989); Rule 29.15(j). To be entitled to an evidentiary hearing on a post-conviction relief motion, the movant must allege facts, not conclusions, which, if true, would warrant relief; the allegations

of fact must not be refuted by the record; and the matters complained of must have resulted in prejudice to the movant's defense. *Robinson v. State*, 772 S.W.2d 770, 771 (Mo.App.1989). Defendant claims that his counsel was ineffective in failing to object to the medical examiner's testimony that no visible gunpowder residue was found around Smith's wound, and in failing to present evidence which would allegedly show that Smith had residue on his hand. The motion court's holding that these claims were non-meritorious is not clearly erroneous. Defendant also faults his counsel for eliciting and failing to object to evidence of other crimes. Defendant further claims that counsel was ineffective for presenting both the defense of self-defense and the defense of diminished capacity, because the defenses are inconsistent. The motion court found that this was trial strategy which is not a foundation for finding ineffective assistance of counsel. *Sanders v. State*, 738 S.W.2d 856, 858 (Mo. banc 1987). Furthermore, the defenses are not necessarily inconsistent. We cannot say the motion court was clearly erroneous. Defendant asserts ineffective assistance of counsel in counsel's failure to present evidence that the rifle could have been loaded with an extra bullet so that it appeared full after one firing. This would have been futile, as the State could have argued that defendant reloaded after he shot himself. Counsel cannot be held ineffective for failing to do that which would have been futile. *Sidebottom v. State*, 781 S.W.2d 791, 799 (Mo. banc 1989), *cert. den.* — U.S. —, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). Defendant also asserts ineffective assistance in counsel's failure to request a recess during jury deliberations. As defendant was not prejudiced by his counsel's actions, his claim must fail.

■ Defendant claims that the Rule 29.15 motion court erred in denying his claims of ineffective assistance of counsel with regard to his counsel's failure to object to the prosecutor's closing arguments, and for failure to make an offer of proof with regard to the psychiatric testimony. Our finding that defendant suffered no prejudice on his direct appeal claims serves to establish that defendant was not prejudiced as a result of his attorney's inaction. *Sidebottom v. State*, 781 S.W.2d 791, 796 (Mo. banc 1989), *cert. den.* — U.S. —, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990).

■ Defendant claims that the Rule 29.15 motion court erred in denying his motion without making findings of fact and conclusions of law on his contention that his absence during the trial court's submission of the hammer instruction to the jury denied him his constitutional right to be present at a critical stage of trial. Rule 29.15(i) requires that the motion court issue findings of fact and conclusions of law on all issues presented, whether or not a hearing is held. Defendant properly complains about the insufficiency of the findings of fact. However, defendant is entitled to a hearing on his claim only if he demonstrates prejudice. *Robinson v. State*, 772 S.W.2d 770, 771 (Mo.App.1989). Defendant has not demonstrated prejudice, and we find none. An order by this court remanding for further findings of fact would be a useless act, which is not required by the law. *Townsend v. State*, 740 S.W.2d 328, 329 (Mo.App.1987).

Judgment affirmed.

STEPHAN and CRANE, JJ., concur.