**STATE of Missouri, Plaintiff–Respondent,**

**v.**

**William H. MASON, Defendant–Appellant.**

**No. 24736.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 31, 2003.

David A. Yarger, Versailles, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Assistant Attorney General, Jefferson City, for respondent.

KENNETH W. SHRUM, Judge.

William Mason ("Defendant") appeals his conviction for second-degree statutory rape in violation of § 566.034, RSMo

(2000).[1] Defendant urges reversal based upon the following: (1) the evidence was insufficient to support his conviction in that the victim's testimony was uncorroborated; (2) the trial court erred in certain evidentiary rulings; (3) the "senior judge" who tried the case "was without jurisdiction" because the case was never assigned to him; and (4) the jury was "coerced" into a guilty verdict because it was required to deliberate the same day it spent twelve hours hearing evidence. Finding no merit in these claims, we affirm the judgment of conviction and sentence.

## FACTS

Defendant was the stepfather of C.L.K. ("Victim"), a female born July 3, 1985. Originally, Victim's mother ("Mother") cohabited with Defendant, but then married him in 1993. Beginning with the cohabitation period and until March 20, 2001, Victim and her younger brother lived with Mother and Defendant. According to Victim, Defendant started abusing her sometime before 1993.

In the fall of 2000, Victim began dating seventeen-year-old D.C. ("Boyfriend"). Soon, Victim and Boyfriend began skipping school so they could go to the mall or to Boyfriend's house where "sometimes [they] . . . would have sex." To explain her absences from school, Victim forged Mother's signature on over twenty "excuse" notes and gave them to school officials. When Victim began her relationship with Boyfriend, Defendant repeatedly objected and "broke [them] up approximately three or four times." He also accused Victim of having sex with Boyfriend.

On March 20, 2001, Defendant awakened Mother and showed her a letter he had found in Victim's clothing. The letter, written by Boyfriend, contained sexually explicit details about their conduct. Defendant's questions to Victim about the letter led to an argument between them. During this confrontation, Defendant again accused Victim of having sex with Boyfriend and demanded that she stop seeing him. Victim responded by becoming "very emotional," repeatedly denied misconduct with Boyfriend, and accused Defendant of a long-term sexual relationship with her. When Mother turned to Defendant to ask about the accusation, she described him as having "a look of being caught." Moreover, Defendant's only response to Mother's inquiry was: "That's bullshit."

Defendant said nothing further to Mother or Victim, but began writing out a will leaving his possessions to his biological daughter, B.M. Then, Defendant retrieved a gun from a closet and threatened suicide. Thereon, Mother left with the children, and she and Victim reported the crime to the police. Defendant was arrested later that day at the home.

At trial, Victim testified Defendant began fondling her breasts when she was approximately seven years of age. He began having sexual intercourse with her (at least once per week) when she was ten years old. Dr. Brayfield, a physician who examined Victim, testified that her physical and mental condition was consistent with sexual assault. His findings included a "defect" in Victim's hymen. When asked if he could tell whether the defect was caused by intercourse with an eighteen-year-old or a fifty-year-old man, Dr. Brayfield answered, "no." He also admitted he did not know when the defect occurred.

The offense for which Defendant was convicted was the last time he had intercourse with Victim, specifically on March 20, 2001. Victim testified she had been up late trying to get a younger sibling to

---

1. All statutory references are to RSMo (2000), unless otherwise stated.

sleep. She finally went to her bedroom between 2:00 and 3:00 a.m., whereon she found Defendant asleep in her bed. Victim wanted Defendant out of her bed; so, she woke him and told him she had school the next day. Defendant told her to lie down, and she complied. He then undressed Victim, undressed himself, got on top of Victim, and put his penis in her vagina. After about ten minutes, Defendant removed his penis from inside Victim and ejaculated on her stomach. He then wiped off her stomach with a paper towel, got up, dressed, and went to the living room couch.

After Defendant was charged, his case was moved to Laclede County on a change of venue and tried before Judge Carl Gum, a senior judge. After a two-day trial (November 1–2, 2001), the jury retired at 8:00 p.m. on the second day and returned a guilty verdict of second-degree statutory rape approximately three hours later. This appeal followed.

### Point I: Submissibility of the Case

■ Defendant's first point maintains there was insufficient evidence to support his conviction. He claims the trial court erred in overruling his motion for judgment of acquittal because evidence of the crime consisted solely of Victim's testimony that "was so contradictory, incomplete, and so indefinite after having been impeached ... that such evidence required corroboration." In essence, Defendant claims that Victim's out-of-court statements and deposition testimony, where she admittedly lied repeatedly about her relationship with Boyfriend and other collateral matters, rendered her at-trial testimony inherently unreliable unless corroborated.

Regarding her deposition testimony, Defendant maintains that Victim lied therein when she (1) denied any sexual intercourse with Boyfriend; (2) denied the validity of what Boyfriend put in his letter about their sexual conduct; (3) denied Boyfriend had furnished her with a home pregnancy kit; (4) denied sex acts with Boyfriend when they skipped school; and (5) did not mention she had initially assured Mother of the truthfulness of her claims of no sex with Boyfriend. As to her out-of-court statements, Defendant points to evidence that (1) Victim lied to police, Family Services, Mother, Defendant, and Dr. Brayfield regarding her sexual relationship with Boyfriend; (2) Victim forged documents given to the school when she skipped classes; (3) Victim lied to Mother and Defendant about going to the movies; and (4) Victim's pre-trial statements were that Defendant had sex with her twice monthly, but at trial, claimed this occurred each week. Because of these inconsistencies and contradictions, Defendant claims her testimony must be corroborated. We disagree.

■ In deciding if the State made a submissible case, we review the facts and inferences reasonably drawn from the facts in the light most favorable to the State; all contrary facts and inferences must be disregarded. *State v. Young*, 42 S.W.3d 729, 732–33[2] (Mo.App.2001). "The determination of a witness' credibility and the effects of conflicting or inconsistent testimony are for the trier of fact." *State v. Barnes*, 980 S.W.2d 314, 320[15] (Mo.App.1998).

■ Generally, in sexual offense cases, the uncorroborated testimony of the victim is sufficient to sustain a conviction. *State v. Harris*, 620 S.W.2d 349, 353[5] (Mo.banc 1981); *State v. Wood*, 355 Mo. 1008, 199 S.W.2d 396, 398 (1947). There are instances, however, when courts have overturned verdicts by applying the so-called "corroboration rule." *See, e.g., State v. Wade*, 306 Mo. 457, 268 S.W. 52 (1924) and cases cited therein. The rule applies

when the testimony of the victim "is so inherently contradictory or unbelievable as to cloud the mind of the court with doubt." *State v. Salkil,* 659 S.W.2d 330, 333[3] (Mo.App.1983). Even so, such instances are rare as Missouri courts look with disfavor on the "corroboration rule" and apply it restrictively only in cases where there are " 'gross inconsistencies and contradictions which bear on proof essential to a case.' " *State v. Kelley,* 83 S.W.3d 36, 43[12] (Mo.App.2002) (quoting *State v. Nelson,* 818 S.W.2d 285, 288–89 (Mo.App. 1991)). If the contradictions or inconsistencies relate to something other than elements of the crime, the rule is inapplicable. *State v. Lee,* 404 S.W.2d 740, 747–48 (Mo. 1966); *Salkil,* 659 S.W.2d at 333[3].

Here, Defendant first argues that Victim's testimony had to be corroborated because of her false statements to Dr. Brayfield, i.e., her denials of sexual intercourse with Boyfriend. Defendant insists the corroboration rule controls the case at bar because "[t]he essential element [in this case] is, does her physical condition, as testified to by Dr. Brayfield, result from acts of [Defendant] or from the sexual relationship between her and [Boyfriend?]" Defendant is mistaken in such argument.

Establishing the cause of the defect in Victim's hymen was not an element of the crime charged. A person commits the crime of statutory rape in the second degree if, being over twenty-one years of age, "he has sexual intercourse with another person who is less than seventeen years of age." § 566.034.1. The jury could have interpreted Dr. Brayfield's finding as corroborative of Victim's claim that Defendant had sexual intercourse with her, but it was in no way essential to prove the crime of second-degree statutory rape.

Defendant's argument also fails because it ignores the fact that Victim's at-trial account of what Defendant did to her was consistent with what she first told her mother and then told others who investigated her complaints. In graphic detail, Victim unequivocally testified Defendant had sexual intercourse with her at a time when she was age fifteen and he was older than twenty-one. Dr. Brayfield testified that when he interviewed Victim, she gave him the same details about Defendant's conduct as related by her at trial. Victim also gave an investigator the same "clear, concise history of sexual assault[ ]" as recounted by her at trial. Moreover, Victim's deposition testimony about the *elements* of the crime was not contradictory to her at-trial testimony on that subject. In sum, the record reveals no contradictions or inconsistencies in Victim's at-trial testimony with what she first reported and then told others about Defendant's criminal conduct with her.

In so stating, we do not ignore Victim's pre-trial lies about her sexual relationship with Boyfriend and other collateral matters such as Boyfriend's letter, the pregnancy test, and skipping school. However, these were not lies, contradictions, or inconsistencies regarding whether Defendant had sexual intercourse with Victim when she was age fifteen and he was twenty-one years old or more. They were lies and inconsistencies on issues other than elements of the crime. Accordingly, contrary to what Defendant argues, the corroboration rule is not implicated. *Lee,* 404 S.W.2d at 747–48; *Salkil,* 659 S.W.2d at 333.

We are mindful there were two other instances where Victim's pre-trial remarks or testimony varied from her at-trial testimony. One such inconsistency concerned a conversation between Victim and Mother before reporting the crime, and the other related to the number of times Defendant raped her per week. Regarding the conversation, Mother testified she spoke with

Victim to make sure everything she claimed was truthful. Victim did not mention this conversation during her deposition. When asked at trial why she never mentioned the conversation during her deposition, Victim said she had forgotten about it. As to the second inconsistency, Victim told police and investigators that Defendant raped her once every two weeks, but testified at trial it occurred once per week. However, " '[t]he occasional lapse of fact does not undermine the probity of that proof ... especially if the lapse occurs in the testimony of a child.' " *State v. Burke*, 719 S.W.2d 887, 888 (Mo. App.1986) (citations omitted).

Here, corroboration of Victim's testimony was not required to make a submissible case because Victim's lies and inconsistent statements did not bear on proof essential to the crime. *See Kelley*, 83 S.W.3d at 43[12]. Further, Victim's testimony was not so " 'contradictory and in conflict with physical facts, surrounding circumstances, and common experience so as to be so unconvincing and improbable that it is extremely doubtful.' " *Lee*, 404 S.W.2d at 747 (citation omitted). To the contrary, her account of the crime was consistent throughout and provided sufficient evidence to sustain a conviction. *Harris*, 620 S.W.2d at 353[5]; *Wood*, 199 S.W.2d at 398. Victim's credibility was a matter for the jury to decide, and this court will not interfere with its decision on appeal. *Barnes*, 980 S.W.2d at 320. Point denied.[2]

### Points II and IV: Evidentiary Rulings

█ In Point II, Defendant contends the trial court erred when it refused to admit exhibit "A" into evidence. This exhibit was the letter from Boyfriend to Victim in which he recounted some of their sexual exploits. Defendant's fourth point maintains the trial court erred by excluding exhibit "B" from admission into evidence. Exhibit "B" contained copies of the twenty forged "excuse" notes Victim gave school administrators. We find no error.

██ Trial courts have broad discretion in deciding the admissibility of evidence, and the decision by the court will be overturned only upon a finding of an abuse of discretion and resulting prejudice. *State v. Jacoway*, 11 S.W.3d 793, 796 (Mo. App.1999). "A court does not abuse its discretion when limiting the admission of cumulative evidence." *State v. Cote*, 60 S.W.3d 700, 706[6] (Mo.App.2001).

If admitted, exhibit "A" would have shown the jury that Boyfriend claimed he had an ongoing sexual relationship with Victim. If the jury believed this, then it could have concluded Victim lied in her pre-trial denials of such a relationship. Moreover, the jury could have concluded Boyfriend caused the defect in Victim's hymen. These facts, however, were already before the jury from various sources including Victim. In his brief, Defendant recognizes exhibit "A" as cumulative evidence when he argues: "Exhibit 'A' was quite relevant as it was *additional graphic evidence* showing both the lack of credibility of [Victim], and ... an alternative cause for the physical condition of the sexual organs...." (Emphasis added). Because exhibit "A" was cumulative evidence, the trial court did not abuse its discretion by excluding it. *Cote*, 60 S.W.3d at 706[6].

2. Victim testified to two physical abnormalities of Defendant near his buttocks and penis that could be viewed only if he were naked. Mother confirmed these abnormalities existed. Arguably, this evidence corroborates Victim's accusations, i.e., from this evidence it was reasonable to infer that Victim had the opportunity to see these abnormalities only because Defendant had sexual intercourse with her.

■ As to exhibit "B," Defendant claims it was "admissible as to the issue of credibility." Victim, however, had already told the jury she forged the notes and gave them to the school so she could spend time with Boyfriend. Other witnesses testified similarly. Copies of the notes would have added nothing to the trial. Since exhibit "B" was nothing more than cumulative evidence, its exclusion was not an abuse of discretion. *Id.*

### Point III: Jurisdiction of the Trial Judge

■ The Honorable Carl D. Gum, a senior judge, tried this case and ruled on all after-trial motions. Defendant never questioned Judge Gum's authority to do so, neither during trial nor in after-trial motions. Even so, Defendant claims on appeal that Judge Gum erred in trying the case and entering judgment therein because he "was without jurisdiction, never having been assigned to act in the cause as required by law."

In making this argument, Defendant relies on Mo. CONST. art. V, § 6 (1945) and § 478.240.3. Such reliance is misplaced, however, as those provisions deal with the assignment of full-time and regular circuit judges, whereas Judge Gum is a senior judge whose appointment and assignment is governed by Mo. CONST. art. V, § 26.3 (1945) and § 476.681.[3] In addition, the record filed with this court refutes his claim that Judge Gum was never assigned to this case "as required by law." Specifically, the supplemental legal file contains an order by the Supreme Court of Missouri dated October 31, 2001, assigning Judge Gum to this case. This order of assign-

ment bears the file stamp of the Laclede County circuit clerk dated November 2, 2001.

In part, Defendant's claim that Judge Gum was not "assigned to act" appears rooted in the fact the assignment order was not filed in the Laclede County circuit court on the day the trial started, i.e., November 1, 2001. This argument lacks merit, however, as nothing in § 476.681 or in art. V, § 26.3 of the constitution specifically requires that an order assigning a senior judge be *filed* in the circuit court before the assignment becomes effective. Any holding that such a filing is a prerequisite to the effectiveness of the assignment would be inconsistent with the statutory goal of using senior judges to improve the efficiency of the courts and reduce caseloads. § 476.415.3; § 476.681.2. *See, e.g., Jones v. Chrysler Corp.*, 731 S.W.2d 422, 430 (Mo.App.1987).

In his reply brief, Defendant appears to advance a different argument, namely, the Supreme Court of Missouri issued the order of assignment after the trial ended and back-dated it to October 31, 2001, and the office of the Laclede County circuit clerk backdated its file stamp to November 2, 2001. This argument is wholly speculative and unsupported by the record. It is well settled that courts speak only through their records and such records import absolute verity. *State ex rel. Nassau v. Kohn*, 731 S.W.2d 840, 843[2] (Mo.banc 1987). With exceptions not shown to exist here, an appellate court will not consider matters *de hors* the record. *Citizens For Safe Waste Mgmt. v. St. Louis County Air Pollution Control App. Brd.*, 896 S.W.2d 643, 644 (Mo.App.1995). Being unsupport-

**3.** "Any retired judge ..., with his consent, may be assigned by the supreme court as a senior judge to any court in this state. When serving as a senior judge he shall have the same powers as an active judge." Mo. CONST. art. V, § 26.3 (1945). Section 476.681.2 empowers the supreme court to, *inter alia,* appoint a senior judge "for a specific case or cases or for a specified period of time not to exceed one year."

ed by law or fact, this belated argument is rejected. Point III is denied.

### Point V: Jury Deliberations

■ In his final point on appeal, Defendant alleges his conviction was the result of a "verdict by coercion." The trial lasted two days. On the first day, the trial commenced at 8:30 a.m. and recessed at 7:00 p.m. On the second day, the trial began at 8:30 a.m., and the case was submitted to the jury at 8:00 p.m. The jury deliberated until 11:15 p.m. when it returned a guilty verdict of statutory rape in the second degree. Defendant argues as follows:

"It is quite clear that a jury working these hours over a two (2) day period would have had to have been extremely fatigued at the time the cause was submitted to them. The final day of the trial was a Friday and, of course, no one wanted to work on the following Saturday, all of which resulted in the totality of circumstances resulting in coercion to reach a verdict."

■ The length of time a jury is allowed to deliberate is a matter within the sound discretion of the trial court, and the time factor, standing alone, does not conclusively establish coercion. *State v. Snider*, 869 S.W.2d 188, 192[1] (Mo.App.1993); *State v. Bell*, 798 S.W.2d 481, 485 (Mo.App. 1990). "In order to establish an abuse of that discretion it must be shown that, based on the record of what was said and done at the time of trial, the verdict of the jury was coerced." *State v. Anderson*, 698 S.W.2d 849, 853[8] (Mo.banc 1985). "Where the 'totality of the circumstances' demonstrates that the trial court was virtually directing that a verdict be reached[,] a verdict of guilty is the product of coercion and must be set aside." *State v. McNail*, 767 S.W.2d 84, 86 (Mo.App.1989). Also, as a general rule, the amount of time a jury decides to spend deliberating is within the jury's determination. *State v. Kinder*, 858 S.W.2d 838, 840 (Mo.App. 1993).

Here, the record conclusively shows this verdict was not the product of coercion. For instance, during the first day of trial, immediately before a recess, the court stated the following to the jury:

"I also . . . would like for you to consider how late you can stay tonight. Now if somebody has an obligation and they can't stay I want to know about it, but I think we'll plan on going until probably 7 o'clock tonight in order to finish in two days. Now if you all would rather stop at four-thirty or five and come back on Saturday, we can do that too."

"It has been my experience, most juries would rather go after it and get it done and not have to come back an extra day, so if you could visit about that during the break we'll stand in recess for ten minutes."

After the second day of trial, the jury retired to deliberate at 8:00 p.m., and at 11:00 p.m., the judge requested that the jury be brought back to the courtroom. The judge spoke to the jury as follows:

"You all have been a great jury. You put in a long two days and it's nearly 11 o'clock at night, and it's been my experience it's pretty difficult after putting in a long day and many hours of deliberation, you've been deliberating three hours now. Sometimes it's better to go home and get a good night's sleep and come back in the morning and you can reach a verdict pretty quickly. That would be what I would propose, but if you would rather stay-"

"You would rather stay?"

"Okay, great."

The jury returned at 11:15 p.m. with a guilty verdict.

The trial judge afforded every opportunity to this jury to decide how to conduct its deliberations. The jury had the option to stop deliberations that night and come back in the morning. It chose to continue deliberating which was wholly within its judgment. *State v. Peck,* 429 S.W.2d 247, 252[11] (Mo.1968); *State v. Richmond,* 321 Mo. 662, 12 S.W.2d 34, 36 (1928).

Moreover, it cannot be said that the trial judge abused his discretion by allowing the jury to deliberate until 11:15 p.m. after two full days of trial. In *State v. Stallings,* 812 S.W.2d 772 (Mo.App.1991), the jury retired to deliberate at 4:42 p.m. on the fifth day of trial and returned a verdict the next morning at 5:20 a.m. On appeal, the defendant urged reversal on the theory the verdict was coerced. The *Stallings* court rejected the argument by first noting that, standing alone, neither twelve night-time hours of deliberation, nor giving of the "hammer" instruction after nine hours, established coercion. *Id.* at 776[2]. Because the jury continued to make inquiries of the court throughout the night and did so without complaints of fatigue or a request for an opportunity to rest, the *Stallings* court found no abuse of trial court discretion in allowing the jury to continue deliberating until it reached a verdict. *Id.* at 777. The *Stallings* court cautioned, however, that the better practice would have called for the trial judge to ask jurors at a reasonable hour if they preferred to continue deliberations the next day. *Id.*

Here, Judge Gum followed the practice recommended by *Stallings,* i.e., he asked the jurors at a reasonable time if they wanted to continue or come back the next day. The jury opted to continue which was its prerogative. This record clearly shows that nothing said or done at trial coerced this jury into its verdict; consequently, no abuse of discretion is shown. Point denied.

The judgment of the trial court is affirmed.

PREWITT, P.J., and RAHMEYER, C.J., concur.