**STATE of Missouri, Respondent,**

v.

**James R. SCOTT, Appellant.**

Nos. WD 50480, WD 52035.

Missouri Court of Appeals,
Western District.

Feb. 25, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 1, 1997.

Application to Transfer Denied
May 27, 1997.

Gary E. Brotherton, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas, City, for Respondent.

Before LOWENSTEIN, P.J., and BRECKENRIDGE and EDWIN H. SMITH, JJ.

LOWENSTEIN, Presiding Judge.

"Causing Catastrophe" is denominated as a class A felony in § 569.070, RSMo 1994. Effective in our law in 1979, and located in our statutes just after those crimes involving

arson, this section denounces, as here relevant, knowingly causing a catastrophe by flood which results in substantial damage to five or more buildings or inhabitable structures, or seriously impairs the usefulness or operation of a vital public facility.

The July 1993 flood along the Mississippi River provides the backdrop for the charges against the defendant, James Scott. The area in question is in Marion County, near the area where Durgin Creek and the North Fabius River enter the Mississippi. Scott was charged in Marion County, under § 569.070, with breaking or causing the West Quincy Levee on the Mississippi, which was above flood level, to fail, resulting in the flooding of some 15,000 acres of land, the destruction of over 100 buildings (including a gas station which exploded during the flood), and the closing of Highway 24 and a bridge across the river. After a change of venue, the case was tried to a jury in Adair County. Scott was found guilty of causing a catastrophe, and sentenced as a prior and persistent offender to life, the sentence to be served consecutive to an Illinois incarceration of ten years.

Levees are earthen dams built up along river banks. In this particular area, there had been intense rains in late June and early July, and residents were advised of expected high levels of the Mississippi. Sand and additional earth were added to shore up the levees in the seventeen mile stretch surrounding the levee that failed. Prior to the failure of the West Quincy Levee, to protect against erosion and a higher crest, the Levee District placed heavy plastic sheets over the tops of the levees and weighted the sheets down with uninterrupted rows of sandbags. Patrols of Levee District employees, the National Guard, Corps of Engineers, workers from the Missouri and Illinois Departments of Transportation, and numerous volunteers watched the situation very closely, both day and night. They would report and make repairs when any levee showed signs of eroding or failing. On July 16, the West Quincy levee, the area of the Mississippi with the fewest levee problems, had been patrolled at 5:30 p.m. and then again at 6:00 p.m. No problems were noted.

Earlier on the 16th, the river crested a foot or two below the top of the levee. At approximately 8:20 p.m., the West Quincy Levee allowed a small stream of water into the adjacent farmland. In a matter of minutes, the rupture had grown so wide a large barge from the Mississippi entered into the expanding area of the flood, and moved over what had been dry land. Sabotage was immediately suspected as the cause of the levee failure. Facts supporting a sabotage theory are: 1) the strength of this levee; 2) the rapid failure of the levee; and 3) the river level was receding and had not come over the top of this levee. Experts for the state testified sabotage led to the West Quincy levee failure, and explained that the break could have occurred if someone had removed sand from the top or cap of the levee. Scott's expert witnesses opined the levee failure could not have been caused by a person removing sandbags or plastic covering from the top of the levee. As described above, the subsequent torrents of water caused massive devastation of crops and farmland, with the destruction of over 100 buildings, as well as highway and bridge closures.

Incredibly, just after the levee failure, the defendant was interviewed about the flood in a live, on-the-scene, Fox Network Television newscast. These interviews showed Scott telling a reporter he had been on the levee and had witnessed signs of failure, but his warnings to authorities had gone unheeded. A videotape of the news interview was introduced in evidence. The Adams County, Illinois sheriff and his deputy saw the telecast, and became suspicious because of Scott's arson record, and because he was admittedly on the levee alone the day of the 16th. They were also familiar with Scott because he was a suspect in several crimes they were investigating at the time. During questioning in Adams County regarding the levee break and unrelated criminal matters, Scott told law enforcement personnel he was voluntarily patrolling the West Quincy levee on the day of the break, as well as several days prior to the break. His statement included admissions of his presence on the levee on the 16th, having been on the spot where the break occurred, having tried, without suc-

cess, to advise workers of leaks, and his taking several sandbags off the top to draw more attention to his concerns. He left the levee to advise workers of the continuing problems. On his return, he said he saw water coming over the top and through the levee, tried unsuccessfully to stop the flow, and then fled. Several witnesses, including officials in charge of this particular levee and those who inspected it at regular intervals, testified they never heard any report of a problem, nor saw any evidence of impending failure prior to the actual rupture on the evening of the 16th. They testified they had seen no unauthorized persons on the levee during their periodic checks. The defendant was not authorized to go upon nor inspect any levee.

Scott was seen on a nearby bridge just after the break. Several witnesses saw a lone man, who looked like Scott, on the levee just prior to the break, but they could not swear Scott was that person. Several other witnesses testified that Scott told them before the 16th he was going to break the levee because he was having an affair and wanted his wife to get stuck on the other side of the Mississippi. Other witnesses recounted having been told by Scott he enjoyed seeing people's property being destroyed, and if there was a flood, the fishing would be better.

Introduced over objection were portions of a videotaped interview Scott gave, after his arrest, to a television crew doing a show on arson. This will be referred to later as the Fox video. In the video, Scott told of having been an arsonist and having been careful and very good at this activity.

### DIRECT APPEAL

#### I.

This point presents the issue of tailoring a proper remedy where the state has not complied with discovery by failing to timely disclose defendant's inculpatory oral statements to state's witnesses. Rule 25.03(A)(2). On the second day of trial, and early in the presentation of its evidence, the state sought to question two witnesses about statements made by Scott *after* the levee failure, which indicated he wanted to cause a flood so his wife would be trapped on the other side of the river and he would be free to party and engage in an extramarital affair. As stated above, several witnesses testified that in the days *before* the levee failure, Scott made statements about tearing down the West Quincy Levee, "... to get his wife stuck over there so he could have a party and some stuff", and so, "he could have parties at his house, and so there would be real good fishing over in the fields after it broke."

The two witnesses, Anderson and Flachs, were properly disclosed as witnesses, but no indication was given to the defendant of these inculpatory statements. Flachs and Anderson, according to the prosecutor's explanation to the judge, would testify as to Scott's statements *before* the break in the levee. The prosecutor told the trial court he had just recently been told of Scott's inculpatory statements *after* the levee broke when he interviewed the witnesses (witness Anderson told of Scott's admission approximately a week before trial, the other was interviewed by the prosecutor the second morning of trial) but felt he was not obligated to disclose this additional line of their testimony to the defendant. These recent revelations were unknown to the police or, at least, not in police reports. The prosecutor believed he had to disclose only the written statements of the defendant, but as ruled by the trial judge, Rule 25.03(A)(2) clearly requires "... the substance of any oral statements made by the defendant ...," to be disclosed.

The precipitating event for this point, contained in the direct exam of witness Anderson, is now set forth:

Q. Did the defendant ever tell you he was going to break the levee?

A. Yes.

Q. What did he say?

A. He said he wanted to get his wife stuck over there so that he could have a party and some stuff.

Q. How many times did the defendant tell you this, if you remember.

A. Maybe twice.

Q. Do you remember when they were?

A. No. It was probably a week or so before it broke.

Q. And after the levee broke, did the defendant ever tell you whether or not he had broken the levee?

A. Yeah.

Q. What did he say?

A. He said that—

MR. ESTES: [defendant's counsel] I'm going to object, Your Honor. May I approach?

THE COURT: Yes, indeed.

[Proceedings at the bench:]

\* \* \* \* \* \*

MR. ESTES: Your Honor, this is a purported statement of my client that has not been disclosed to me.

The chambers conference on the objection to the Anderson testimony of statements of the defendant made after the break, brought out the prosecutor's disclosure as to the later scheduled witness, Flachs, in the following colloquy:

MR. JACKSON: [prosecutor]

If I may, Your Honor, on a related topic, I am now disclosing to the defense that Joe Flach or Flachs, whom I talked to and met with for the first time this morning, advises me that the defendant gave a statement to him admitting that he did this; and I am disclosing this at this time.

MR. JACKSON: That the defendant told him—this was some time, I believe he said a week or two after the levee break—the defendant admitted to him that he broke the levee and he told him how he broke the levee.

THE COURT: All right.

MR. ESTES: Judge, this more or less shoots my theory of defense all to hell. I request a mistrial if they are going to put on this guy. I mean I need to depose this witness, obviously.

THE COURT: Well, Mr. Jackson, you learned this this morning, but how did you learn it? How long have the police known it?

MR. JACKSON: The police never knew it.

Counsel for the defendant told the court he had prepared a defense acknowledging his client's statement to the police that he had indeed removed several sandbags, but this admission was to be counteracted by expert testimony which would refute that such actions could have caused the break, and this trial strategy (such as having the defendant testify) as outlined in voir dire and opening statement would now be out the window. Specifically, counsel said the only effective remedy for nondisclosure would be to totally exclude the testimony or grant a mistrial.

In voir dire, building on a theme that people with criminal records might sometimes, out of fear, admit guilt to police about something they had not done, counsel for Scott asked the potential jurors, "[N]ow it is going to come out in the trial that Jim does have prior convictions, okay? He is going to take the stand and that evidence will come out, okay?"

In opening statement, counsel explained Scott's testimony would be as follows: Scott worked on the levee most of the day and noticed cloudy water seeping in, which meant the levee was eroding. He attempted to alert the National Guardsmen of his observations, but no one listened to him. Later in the afternoon, he removed four or five sand bags. Later, when the levee began to fail, Scott told Transportation workers of the break, and ran for safety. When he got to the bridge, he was interviewed by a television reporter. Law enforcement personnel who saw the telecast, and were aware of Scott's "convictions for arson in the past," became suspicious and questioned him the next day. Several weeks later, with a burglary warrant for his arrest, police questioned Scott again. Several days later, police questioned him for a third time, and it was during this interview that Scott said he removed four or five sandbags, left the area, and when he returned, the water was flowing in where the bags had been removed.

After allowing defense counsel time to interview both witnesses as to this new development of post flood admissions, a new complication emerged. Not only had Scott admitted, post-flood, that he broke the levee, he apparently told witness Flachs

*how he had caused the break.* Flachs told defense counsel how Scott broke the levee. Flachs said he relayed this information to a Quincy, Illinois police officer a month before trial. The prosecutor interviewed Flachs before the start of the second day of trial during the state's presentation of evidence. This disclosure came just before noon, after an objection was raised regarding the question to the other witness, Anderson.

The court ruled the prosecutor had violated Rule 25.03(A)(2) rendering the line of testimony as to statements *after* the levee break inadmissible on direct exam in the state's case, but such testimony could be used as rebuttal if the defendant took the stand. The trial court refused to absolve the state because some of defendant's oral statements were made to Illinois law enforcement personnel. The court refused to accept the state's explanation the witnesses could have been interviewed by the defense to avoid the surprise. The defendant's request for a mistrial was denied. Defense counsel argues to this court the trial court's remedy denied the defendant a fair trial in that he planned on his client testifying, advised the jury of his client's prior arson conviction in his opening statement, his expert witness was given police reports containing Scott's statements regarding his actions on the levee, and formulated an opinion, to which he would soon testify that Scott's taking a few sandbags off the top of the levee could not have caused the break.

To the credit of the assistant attorney general, the state, in its brief and at oral argument, did not assail the trial court's determination of a Rule 25.03 disclosure violation. The state departs from the point raised here and maintains the trial court's remedy was sufficient, and as such, did not alter the outcome of the case.

After presentation of all the preceding information, the crux of the issue contained in this point remains: Without declaration of a mistrial, were the defendant's due process rights infringed by disclosure of his inculpatory statements during trial?

■ The prosecutor's response to the defendant's request for discovery of the defendant's oral statements did not comply with Rule 25.03. *State v. Guidorzi*, 895 S.W.2d 225, 232 (Mo.App.1995). "The question remains, however, whether the failure to disclose resulted in fundamental unfairness or prejudice to the defendant." *State v. Smothers*, 605 S.W.2d 128, 131 (Mo. banc 1980). The purpose of discovery is to allow the defendant a decent opportunity to prepare in advance for trial and to avoid surprise. *State v. Mease*, 842 S.W.2d 98, 104 (Mo. banc 1992), *cert. denied* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993). Because of the impact of a defendant's inculpatory statement upon a jury, the need for pretrial opportunity to prepare is evident. *State v. Scott*, 479 S.W.2d 438, 442 (Mo. banc 1972), quoting from *State v. Johnson*, 28 N.J. 133, 145 A.2d 313, 315–6 (1958). "The discovery rules seek to foster informed pleas, expedited trials, a minimum of surprise, and the opportunity for effective cross-examination." *State v. Wells*, 639 S.W.2d 563, 566 (Mo. banc 1982). The rules on pre-trial discovery aid in the truth finding aspect of the legal system. *State v. Whitfield*, 837 S.W.2d 503, 507 (Mo. banc 1992). The rules for criminal discovery are not "mere etiquette," nor is compliance a matter of discretion. *State v. Luton*, 795 S.W.2d 468, 477 (Mo.App.1990). As this court said in *State v. Scott*, 647 S.W.2d 601, 606 (Mo.App.1983), "[R]ights of discovery provided criminal defendants by Rule 25 have constitutional underpinning rooted in due process," and in *State v. Stapleton*, 539 S.W.2d 655, 659 (Mo.App.1976), " . . . the rules of criminal discovery are not a mere etiquette but the festoons of due process."

■ The remedy for violation is within the sound discretion of the trial court. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc 1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). Again, an abuse of the trial judge's discretion occurs where the fashioned remedy results in a fundamental unfairness to the defendant, or the outcome of the case has been altered. *Id.* at 66; *State v. Johnson*, 702 S.W.2d 65, 73 (Mo. banc 1985); *State v. Harry*, 623 S.W.2d 577, 578 (Mo.App. 1981). "Fundamental unfairness" turns on whether there was a reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of

the trial. *State v. Royal,* 610 S.W.2d 946, 951 (Mo. banc 1981); *State v. Grant,* 784 S.W.2d 831, 835 (Mo.App.1990). To warrant a new trial for lack of sufficient relief, the defendant must show the withheld information was material, *State v. Kezer,* 918 S.W.2d 874, 883 (Mo.App.1996), and was not previously known or expected by the defendant in trial preparation. *State v. Matheson,* 919 S.W.2d 553, 559—60 (Mo.App.1996); *State v. Carmack,* 633 S.W.2d 218, 221 (Mo.App.1982); *State v. Hindman,* 543 S.W.2d 278, 285 (Mo. App.1976). "True, important evidence may be discovered at the last minute. In these cases, the trial court must tailor the appropriate remedy to be fundamentally fair to each party." *Whitfield,* 837 S.W.2d at 508.

■■■■ Scott simply contends the court should have sustained his motion for mistrial. A mistrial is a drastic remedy and should only be used when prejudice to the defendant can be removed in no other way. *State v. Williams,* 853 S.W.2d 371, 376 (Mo.App. 1993). A motion for mistrial lies within the trial court's sound discretion and the decision to deny will not be disturbed absent an abuse of discretion. A mistrial is not required just because a Rule 25.03 violation by the prosecutor has occurred. *State v. Johnson,* 524 S.W.2d 97, 101 (Mo. banc 1975).

■■■ The trial judge, during the state's case, on the second day of trial, was presented with the state's nondisclosure of inculpatory statements of the defendant and was thrust into tailoring a remedy fair to all. Clearly, defendant's counsel was surprised by the state's attempt to admit into evidence post-flood admissions by his client that the client caused the levee failure and how he caused the levee failure. Counsel promptly objected and made an immediate record as to how he had committed to the trial strategy which included: having his client testify, admitting that his client removed several sandbags, having experts (professors from the University of Missouri at Rolla) testify Scott's admitted actions could not have caused the failure. Counsel had indeed promised the jury that Scott, a convicted arsonist, would take the stand. The trial court's ruling to exclude the witnesses testimony during the state's case left the defen-

dant with a Hobson's choice. *Scott,* 647 S.W.2d at 606. If Scott took the stand, and told of taking four to five bags off the top of the levee, then the state, in rebuttal, could call the two witnesses to testify as to the defendant's contradictory statements to them, which amounted to admissions of guilt of the charges. Counsel chose to proceed and not call his client to the stand.

Defense counsel's trial strategy argument highlights three important factors present in this case which bear greatly on the merit of this point. First, unlike many of the cases on non-disclosure, the damning evidence was never presented to the jury. Much of the case law in this area deals with the surprise evidence being put before the jury to the prejudice of the defendant. *See e.g., Stapleton,* 539 S.W.2d at 658—59 (The jury heard from a witness that defendant admitted what he had done was wrong, where at trial, a self-defense theory was presented and the court said this "was unfair evidence received by surprise, and should have been redressed by the court."); *State v. Harrington,* 534 S.W.2d 44, 47 (Mo. banc 1976) (trial strategy was self-defense and statement to the FBI, disclosed at trial, asserted accident, held to require reversal); *State v. Kehner,* 776 S.W.2d 396 (Mo.App.1989) (the conviction was reversed where unexpected testimony permitted at second trial). The prejudice, or unfairness in the case at bar, is more difficult to define or assess. The trial court's ruling affected the defendant's trial strategy, and his announced decision to testify. The jury, without the surprise evidence, found him guilty and recommended the maximum punishment. Second, the timing of knowledge and when the new evidence came to light in the course of the trial makes a difference on the question of prejudice. Here, after the jury was advised the defendant had a criminal record and would be testifying, defense counsel's strategy was at risk. This contrasts with the following scenarios where rulings were held not to amount to an abuse: In *State v. Castillo,* 853 S.W.2d 381, 384 (Mo. App.1993), the prosecutor, four days before trial, discovered certain information and "immediately faxed a copy of the statement to appellant's counsel." In *U.S. v. Levine,* 700

F.2d 1176, 1181–2 (8th Cir.1983), the defendant's statement was discovered and promptly sent to the defendant on the Friday before trial. In *U.S. v. Collins,* 764 F.2d 647 652–3 (9th Cir.1985), the defendant's statements were forwarded to the defense, and counsel said "... he might have approached the case from a different perspective." Counsel on appeal cannot successfully argue in "conclusory fashion that the outcome of his trial would have been different ..." *State v. Toler,* 889 S.W.2d 158, 161 (Mo.App.1994). The third factor here is quite obvious from the recitation of the facts—there was overwhelming evidence against Scott. His statements, his conduct, his presence at the scene, and his admission of taking sandbags off the levee prior to the flood, make his defense strategy tenuous at best. There is authority that if the evidence of guilt is strong, "... it is hard to see how Defendant could have been prejudiced ... and it is highly unlikely the outcome of the case was altered by the admission ... of the testimony." *State v. Boyce,* 887 S.W.2d 447, 451 (Mo.App.1994); *Toler,* 889 S.W.2d at 161.

Before ruling on this point, more observations must be made. Although not dispositive, it must be pointed out the prosecutor here, though armed with considerable evidence, chose not to disclose Scott's oral post-flood statements to Anderson and Flachs. In truth, from the portion of the trial transcript quoted earlier, it is obvious the state never truly disclosed the post-flood admissions. It is abundantly clear the prosecutor attempted to get this evidence admitted while questioning one witness on the pre-flood statements of Scott. It was only defense counsel's quick response via objection, that led to the ultimate explanation by the state that the new evidence was obtained from a potential witness a week before trial and from the witness on the stand that very morning. Since the state sat on the evidence of one witness for the week prior to trial, and the evidence of a second witness for the first day and a half of trial, it can hardly be said that evidence was newly discovered. *Whitfield,* 837 S.W.2d at 508. The state's strategy to surprise was obvious. *Id.* The prosecutor's citation of authority for this nondisclosure to the trial court was wrong.

*State v. Miller,* 778 S.W.2d 292, 294 (Mo. App.1989) deals only with written and recorded statements of *witnesses.* (emphasis added) Rule 25.03(A)(1). The law is both old and clear that the statements of the *defendant* must be disclosed. The prosecutor's reasoning that Scott's oral statements in question were entering the trial through the testimony of other witnesses, is incorrect, and if followed to its logical conclusion, would totally destroy the portion of Rule 25.03(A)(2) dealing with oral statements of the defendant.

Next, the response of the defendant was immediate. Unlike counsel in *Smothers,* 605 S.W.2d at 132, counsel immediately asked for a mistrial based on his trial theory and exercise of that theory before the jury. Unlike the scenario in *Kilgore,* 771 S.W.2d at 66–67, counsel asserted the surprise was prejudicial, he told the jury his expert witnesses were going to testify that the acts of the defendant could not have caused the levee to fail, and that the jury would be able to see and hear from his client to explain what he had actually done on the levee.

Next, the following language in *Luce v. United States,* 469 U.S. 38, 42, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984), "a reviewing court cannot assume the adverse ruling motivated a defendant's decision not to testify," does not enter into the equation under these facts. *Luce* concerned an in limine ruling on use of a prior conviction to impeach. The defendant there did not testify and there was no record to show just what motivated the defendant's decision to not take the stand. In this case, an extensive record was made showing why the ruling would prohibit the defendant from taking the stand. Also inapplicable to the unusual facts here is *State v. Brittain,* 895 S.W.2d 295, 298 (Mo.App.1995).

Finally, the argument that defendant had the ability to question witnesses Anderson and Flachs before trial and get the same information the prosecutor obtained, is contrary to the law and, if followed, would defy the spirit of the rules of criminal discovery. Under our rules, the burden is on the state to produce the requested material, and the state is in "no position to shift the blame

..." *State v. Moore*, 645 S.W.2d 117, 119 (Mo.App.1982). Similarly, the contention the admissions were also made to the Quincy, Illinois police and could have been discovered by diligent defense work, will not fly. Fleeting reference was made by the prosecutor that the admissions were made to an Illinois law enforcement agency over whom he had no control to see that the statements were in their reports. Such a contention is hollow. The county prosecutor's office "... is an entity and as such it is the spokesman for the Government." *Giglio v. U.S.*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). "The prosecution is not excused from informing the defendant that it intends to use evidence on the grounds that the evidence is not in its possession." *State v. Childers*, 852 S.W.2d 390, 391 (Mo.App.1993).

With all that has just been said, the difficult decision remains to be answered, under abuse of discretion review, did the sanction imposed result in a fundamentally fair response to the discoverable evidence, the defendant's inculpatory statements, which the prosecution attempted to admit during the state's case? *Kilgore*, 771 S.W.2d at 66.

Several cases on the effect of late disclosure and its affect on the accused's trial strategy are informative. In *State v. Harrington*, 534 S.W.2d 44 (Mo. banc 1976), the defendant asserted self-defense to second degree murder and the state then produced FBI statements where the defendant claimed it was an accident. Reversing the conviction, the court said the defendant committed to a trial strategy of self-defense and "simple justice required" the defendant be allowed to meet a critical element of the state's case. *Id.* at 47.

In *State v. Patterson*, 618 S.W.2d 664, 665 (Mo. banc 1981), the defendant was tried for murdering his rape victim. The state failed to disclose that charges had been dropped against its main witness. The court ruled the defendant was prejudiced and reversed the conviction.

*State v. Wells*, 639 S.W.2d 563, 565 (Mo. banc 1982) involved a second degree murder case wherein the state's witness presented "a new version of the events," by saying Wells threw a log at the victim and admitted hitting the victim with a log. A bloody log was found at the scene. This new version of testimony was unveiled during the state's opening statement. Though reversal came on a combination of grounds, the Supreme Court said the state's conduct served to thwart the goals of criminal discovery. *Id.* at 566.

In *State v. Blake*, 620 S.W.2d at 360, the state endorsed two witnesses at five o'clock on the eve of trial. In reversing, the Court said, "[I]n this case, the record reflects that the trial court exercised its discretion to the prejudice of appellant's right to assert the best defense possible under the circumstances. For instance, one late endorsed witness brought out admissions of appellant which were not previously in the state's file . . . ."

In *State v. Varner*, 837 S.W.2d 44, 45 (Mo.App.1992), the defendant was charged for stealing from a department store. After being chased, the defendant gave a fictitious name to security guards, then gave his real name. Defendant's attorney was informed on the morning of trial the state intended to introduce defendant's use of a "crow name." Defendant was denied a continuance or exclusion of the evidence and he did not testify. Recognizing the discovery violation resulted in fundamental unfairness, the Eastern District found an abuse of discretion and reversed and remanded the case. *Id.* at 46.

*State v. Childers*, 852 S.W.2d at 391—92, involved stealing from a store and an assault on security officers. Reports of the guards, containing oral inculpatory statements of the defendant were not promptly produced and the court reversed saying the defendant had no opportunity to prepare his defense.

In *State v. Kehner*, 776 S.W.2d at 397–99, the court reversed when a witness changed his story and the state failed to disclose the new information. The court found the defendant's self-defense theory was thwarted by the witness giving unforeseen evidence contrary to self-defense.

In *State v. Perkins*, 710 S.W.2d 889 (Mo. App.1986), the defendant requested a continuance or a mistrial where exculpatory evidence was disclosed during voir dire. The

court reversed saying, "Defense counsel prepared for trial without any knowledge of the substance of defendant's statement." *Id.* at 893.

■ Although the trial judge levied a severe sanction here, this court must rule that exclusion of the inculpatory statements during the state's case was not sufficient to remove the prejudice to the defendant in preparing for and trying the case. A new trial will be ordered. In 1972, the Supreme Court clearly expressed in *Scott,* 479 S.W.2d at 438, that inculpatory statements, carrying such great weight with the jury, demand disclosure, and violation of the rule of disclosure examined with grave suspicion. Even though the defense was shaky and the evidence strong against the defendant, he was still entitled to a trial, a defense, and to prepare to testify and be cross-examined. Our cases show the violation of discovery rules can amount to due process violations. If clear violations are condoned, then any unfairness, even the accused's due process rights, can be swept aside by saying the evidence against the convicted person was so strong there would be no change in the outcome. Even if Scott receives the same result on retrial, the system demands a retrial. The words of Judge Somerville in *State v. Charles,* 572 S.W.2d 193, 199–200 here apply:

> In view of the overwhelming abundance of legally admissible evidence to sustain the state's burden of proof, coupled with the brutal and senseless nature of the homicide which was perpetrated, this court has had to steel itself in order to resist the common temptation of attempting to justify or excuse the error precipitated ... Courts are frequently tempted to suspend or abandon the rule of law, particularly so when an especially brutal and senseless offense is involved and evidence of guilt is overwhelming. Courts which yield to this temptation must do so with an awareness that they are substituting the rule of expediency frequently indulged in the streets for the rule of law which they have solemnly sworn to uphold, and they must be prepared to live with the fact that suspension or abandonment of the rule of law in one case establishes a precedent for doing

so in subsequent cases. They must also face the reality that society as a whole is the ultimate loser when the rule of law gives way to the rule of expediency. On balance, a new trial is a small price to pay for preserving the integrity of a fair trial. There are times when cases must be retried in order to maintain the egalitarian purity of the rule of law. This is such a time.

This harsh result, in light of the heinous crime committed, is not the fault of the trial judge. He was confronted with a clear violation of disclosure well into the trial, after strategy had been laid out by the defendant. In chambers the court told the prosecutor, "... frankly, I was astonished that you had this information and had not given it." At that point, a continuance would not have alleviated the prejudice to the defendant. *People v. Pfahler,* 179 A.D.2d 1062, 579 N.Y.S.2d 520, 521 (1992). The judge did the best he could under the circumstances, but having the time here to reflect, the sanction did not remove the prejudice and restore to the accused the right to a defense. The defendant had a right to have the opportunity to formulate a defense in advance of trial, and the state's failure to disclose prevented the exercise of such a right. *State v. Bradley,* 882 S.W.2d 302, 307 (Mo.App.1994). The prosecutor is wholly responsible for unfairly surprising the defendant and the state should not benefit from its own violation of the rule. *United States v. Alvarez,* 987 F.2d 77 (1st Cir.1993); *Moore,* 645 S.W.2d at 119; *Martinez v. State,* 528 So.2d 1334 (Fla.App.1988).

The only fair result is to determine a mistrial should have been declared. Had the information been disclosed by the prosecutor, even on the eve of trial, the court could have granted a continuance. The matter had gone too far to merely allow the defendant time to regroup—the trial was underway, the jury was advised of the defendant's record, his testimony and that of the expert witnesses. As stated by the Mississippi Supreme court in *Moore v. State,* 536 So.2d 909, 911 (Miss. 1988), where the defendant's inculpatory statements to an officer were disclosed shortly before jury selection and a continuance denied, there is no per se rule on discovery

violation, but justice is better achieved when, in advance of trial, each side has reasonable access to the evidence of the other. See also, *United States v. Padrone,* 406 F.2d 560, 561 (2d Cir.1969) (inadvertent failure to produce statement from which defendant was cross-examined as to discrepancy with trial testimony. Reversing the conviction, the court held failure to produce a statement of the defendant made so serious a detriment to the preparation and defense and a strategy already put in place that no other remedy was effective); *U.S. v. Camargo–Vergara,* 57 F.3d 993, 999 (11th Cir.1995), (inculpatory statement to drug agent not produced and used after defendant had stated a defense based on an earlier statement); *Stevens v. State,* 582 P.2d 621, 626 (Alaska 1978), (one of two rape convictions were reversed due to witness's statement obliterating alibi defense. In spite of much evidence of guilt, the Court could not say the evidence did not have an effect on the verdict and ordered new trial.)

 By finding prejudice to the defendant's rights and rendering the trial unfair, the court reverses and remands the conviction for a new trial. There is no question of double jeopardy attaching since the prosecutor's conduct was not intended to coerce the defendant to request a mistrial. *State v. Miner,* 748 S.W.2d 692, 693 (Mo.App. 1988). Since countless cases explaining our applicable rule have said the purpose is to rule out surprise and ambush, the court holds that, on retrial, the parties will be put in the same position as if disclosure made before trial, or mistrial declared because of the posture of the case at the time the statements were disclosed. The state shall be allowed to use the inculpatory post-flood statements of witnesses Anderson and Flachs in its case in chief. *State v. Thompkins,* 318 N.W.2d 194, 199 (Iowa 1982).

\* \* \* \* \* \*

Scott raised numerous other points in this direct appeal and his Rule 29.15 appeal. Due to the ruling here, reversal and remand for a new trial, several of the remaining points will be briefly addressed as they may occur at trial. Needless to say, it would be no more than surmise to now predict the defense's strategy at a new trial based on our ruling on the disclosure violation, so the number of other points addressed will be very limited.

 Scott attacks the trial judge's decision to admit in evidence a six-minute video showing the Ayerco Gas Station fire and the extent of flooding. During the flooding, a gas line ruptured and the gas station exploded. Scott's brief states the video showed "huge billowing black clouds of black smoke and the bright orange flames are hypnotic." The point asserts any probative value of the evidence was outweighed by its tendency "to inflame" the jury. The admission of demonstrative evidence lies within the discretion of the trial court, and may not be overturned unless an abuse can be shown on appeal. *State v. Nyhuis,* 906 S.W.2d 405, 408–09 (Mo. App.1995); *State v. Swigert,* 852 S.W.2d 158, 163 (Mo.App.1993). This video was admissible.

 Likely to occur on retrial is the question of suppression of the videotaped statements Scott gave to the Quincy, Illinois police. Scott asserts the police did not heed his unambiguous request for counsel as required by *Davis v. U.S.,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), a case that followed and explained *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Scott had earlier told the police, as well as other witnesses, of his removing four or five sandbags shortly before the levee failed. When the police later attempted to take the audio and video of those statements, under Miranda, they again asked him about counsel. Scott, no newcomer to police interrogation, was told questioning would stop if he wanted a lawyer before repeating on tape what he had already told authorities. During a lengthy statement, Scott said, "Yeah, can you get me one," then said, "I'll wait ...," and then, "Let's continue." Despite the officers' attempts to get a definitive answer from the defendant, Scott never made a clear request for an attorney and was indecisive at best. *Davis,* 512 U.S. at 459–62, 114 S.Ct. at 2355—57.

Also without merit is Scott's assertion the Quincy police somehow "tricked" him into allowing his previous statements to be recorded. The record shows no such attempt

by the police. The trial court's failure to suppress the recorded statements was not prejudicially erroneous, even assuming Scott's words were a clear indication for counsel under *Davis,* 512 U.S. at 459–62, 114 S.Ct at 2355–57 or *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990), because the content of the taped statements had already come in evidence through other witnesses.

One of the most irksome points concerns the limited introduction during the state's case in chief of the Fox Video in which Scott, in October 1993, after his arrest for this crime and release from jail, voluntarily gave a television interview explaining his having been an arsonist and having been very good at that activity. In this television interview, Scott states that other people's property and concerns are of little importance to him and that, as an arsonist, he is "very, very, very good" at what he does since he did his homework. The defense objection was primarily based on this being evidence of other crimes, as well as being irrelevant to the issue at trial of the levee failure. *See e.g.,* State v. Bernard, 849 S.W.2d 10 (Mo. banc 1993); *State v. Sladek,* 835 S.W.2d 308 (Mo. banc 1992). The defendant said the video was introduced solely for the purpose of showing his bad character, and Scott's having the propensity to commit the crime for which he was now charged. *State v. Douglas,* 917 S.W.2d 628, 630–31 (Mo.App.1996). The prosecution contended there would be no prejudice since the matter of Scott's having been an arsonist was already before the jury via the defendant's opening statement. *State v. Osterloh,* 773 S.W.2d 213, 217 (Mo.App. 1989). The court allowed brief portions of this video to be shown (and a transcript of the dialogue) because Scott's defense involved his admission of taking bags off the levee without the intent to cause the levee failure, so this reference to other crimes came within one of the recognized exceptions to the rule prohibiting mention of other crimes (to show intent or absence of mistake or accident). *State v. Conley,* 873 S.W.2d 233, 236–37 (Mo. banc 1994). Having said all this, the court cannot now tell how this matter might be raised on retrial. Suffice it to say, the state should be well aware of *Conley* and *State v. Garrett,* 825 S.W.2d 954, 957–58 (Mo.App.1992), before retrial.

The other points raised in the appellant's brief should not arise on retrial.

The judgment of conviction is reversed. The cause is remanded for new trial.

All concur.